### ROBERT BELL vs. CITY OF WEST POINT.

1. JUSTICE OF THE PEACE: *Civil jurisdiction. Code of* 1871, § 1302.

The constitutional limitation of the jurisdiction of a justice of the peace to causes, when the principal of the amount in controversy does not exceed $150 (art. 6, sec. 23), is not a limitation to actions *ex contractu*, and it is competent for the legislature to confer jurisdiction in all cases where the subject of controversy is susceptible of pecuniary measurement, within the constitutional limitation. That portion of sec. 1302 of code of 1871, giving jurisdiction of actions for the recovery of personal property or damages, etc., is not unconstitutional. PEYTON, J., dissenting.

2. MUNICIPAL CORPORATIONS: *Liability for defective streets., etc.*

It is well settled that in the absence of any express statute imposing the duty and declaring the liability, municipal corporations having the powers ordinarily conferred upon them respecting streets, etc., are liable in a civil action for special injuries resulting from defective streets, etc. PEYTON, J.

ERROR to the Circuit Court of *Colfax* County.

Hon. J. A. ORR, Judge.

Plaintiff in error, Robert Bell, brought suit before A. H. Taylor, a justice of the peace, against the city of West Point, defendant in error, on a demand for damages, and filed the following bill of particulars, to-wit:

" *The City of West Point to Robert Bell*, Dr. 1875. March 1.

To amount of damages to horse, caused by the negligence and failure of the city to keep in repair a certain bridge on Main street within the corporation, whereby plaintiff's horse was injured and afterwards died, $150."

By leave of the court an amended bill of particulars was filed, which added to the above the following :

" By means of which plaintiff was damaged to the extent of the value of the horse, and in the subsequent loss and injury of his crop resulting therefrom, $150."

The case was tried by the justice of the peace, and judgment rendered for the defendant.

Plaintiff in error took an appeal to the circuit court of said county; a demurrer was interposed, to the effect " that the cause of action stated by plaintiff was insufficient in law, and that the city of West Point was not liable for damages caused to private individuals, for the failure to maintain and keep in repair the bridges upon the public highways or streets within the incorporated limits of the city."

The circuit judge sustained the demurrer, granting plaintiff leave to amend, which he declined to do, and judgment was entered, dismissing the cause at the cost of plaintiff, to which plaintiff excepted, and tendered his bill of exceptions. A motion for a new trial was made and overruled by the court, and the case comes to this court on a writ of error.

The following is assigned for error, to-wit :

" 1. The court erred in dismissing the cause, and in holding that the defendant was not liable for the injury complained of.

" 2. The court erred in refusing to set aside the judgment on the motion for a new trial."

*Barry & Brame*, for plaintiff in error :

The plaintiff was entitled to a trial before the jury under the instructions from the court, or the defendant could have demurred to the evidence with the same effect.

The judgment of the court operated as a compulsory nonsuit, which cannot be done in our courts. After the case goes to the

jury, the court can do no more than to instruct them. 12 S. & M., 551; 3 How., 332. There is no such thing as compulsory nonsuit in this state. Hudson v. Strickland, 49 Miss., 591; 3 How., 332; 2 S. & M., 521; 5 id., 602; 12 id., 550. The question in the case at bar is the liability of the corporation for the damages. Sutton v. Carroll County, 41 Miss., 236. *Quasi* corporations are not liable in the absence of a statute. Dillon on Mun. Corp., §§ 761, 785; 11 Am. Rep., 65 and notes on page 66.

Inasmuch as municipal corporations have ample means for keeping their streets in repair, it is but justice to the citizen, who pays his taxes, performs his street duty, and otherwise performs his duties and bears the burdens of citizenship, that he should receive a reciprocal benefit, and have recourse for damages caused by neglect. In the United States, municipal corporations are liable for damages under the state of facts here alleged, with some exceptions to the rule. Waltham v. Kemper, 55 Ill., 346. 8 Am. Rep., 652, is relied on by counsel. By reference to the facts of that case, it will be seen that the suit was brought against a town that was not incorporated. Hence, it was held that the town stood upon the same legal footing as a county, and was not liable.

The next case relied upon by defendant is Oliver v. Worcester, 3 Am. Rep., 485, in which the court held that the city was liable for an injury that was caused to plaintiff by falling into an excavation made by the authorities upon a common, and not upon a public street.

The plaintiff charges not only negligence, but malfeasance and negligence in its construction and notice to the authorities is expressly charged. Outside of New Jersey, only one decision is found in the United States, where corporations have been held exempt from liability. That one is Detroit v. Blackby, 21 Mich., 84. The decisions in point are numerous. This question has been fully adjudicated by the supreme court of the United States, and no doctrine is more finally settled in that court than that municipal corporations are liable for negligence in case, like the one at bar. See Weightman v. Washington, 1 Black, 39.

THE CHARTER.— The original charter, approved Nov. 20, 1858, sec. 9, gives the mayor and selectmen, general powers to pass all needful ordinances, etc. ; sec. 10 makes persons liable to work on streets ; sec. 11 confers powers to pass by-laws to preserve the health, and to prevent and remove nuisances, etc. ; sec. 12 may keep in good repair streets, sidewalks, etc. ; sec. 7 confers power to raise revenue.  By amended charter of March 14, 1872, the powers were greatly extended.  See Charter.

CITY ORDINANCES.— Sec. 21.  All streets and extensions of streets, now opened and laid off in the city,  *  *  *  are hereby declared to be public streets, subject to be regulated and disposed of by the city authorities.  Code of West Point, p. 48, § 21.  All males over 18 and under 50 are liable to street duty ; may be required to work six days in the year or pay six dollars. Street commisioners shall keep the streets in good repair.

These ordinances are binding on the city, and the court will take notice of them.   Dillon on Mun. Cor., §§ 288, 289, 290.

The street commissioner is required to give bond in $1,000 for the faithful performance of his duty.  This is given for the bene-fit of the city, and is required by the city, not by law.  It is for the benefit of the city, not the citizen, whether the duty of main-taining the streets is a safe condition for public travel; and use is specially imposed on the corporation or is deduced in the man-ner stated, it rests primarily as respects the public upon the cor-poration, and the obligation to discharge this duty cannot be evaded, suspended or cast upon others by any act of its own. Dillon on Mun. Cor., § 791 and notes ; 17 N. Y., 104 ; 9 Mich., 165.  In this view the principle indicted by the maxim *respondeat superior* applies to municipal corporations.   Dillon, § 766.  Inde-pendent of express statutes, see Manderschid *v.* Dubuque, 29 Iowa, 73 ; Collins *v.* Council Bluffs, 32 id., 324 ; Oliver *v.* Worcester, 102 Mass., 489 ; Basset *v.* St. Joseph, 53 Mo., 290 ; 40 id., 569 ; 51 id., 454 ; 45 id., 449.  For further authorities in the absence of express statutes, see, Dillon Mun. Cor., § 789 ; 1 Black (U. S.), 39 ; 5 Bing. (S. C.), 91 ; 3 Barn. & Adolph, 77 ; 2

Black, 418, 590 ; 4 Wall. (S. C.), 657 ; 4 Wall., 189 ; 9 N. Y. (5 Seld.), 163, 170 ; 6 Sandf., 289 ; 9 N. Y., 456 ; 5 id., 369 ; 3 Hill, 612 ; 16 N. Y., 162 ; 5 Seld., 168, 458 ; 1 Denio, 595 ; 16 N. Y., 158, 161 ; 17 id., 104 ; 37 id., 568 ; 45 id., 129 ; 22 Penn. St., 384 ; id., 389 ; 40 Mo., 569 ; 45 id., 449 ; 8 Minn., 154 ; 3 id., 297 ; 5 Kans., 425 ; 11 Humph. (Tenn.), 217 ; 24 Ala., 112 ; 17 Ill., 143 ; 35 id., 58 ; 42 id., 503 ; 44 id., 295 ; 53 id., 91, 407 ; 6 Iowa, 443 ; 29 id., 210, 229 ; 26 id., 264 ; 21 id., 409 ; 4 Ohio St., 80 ; 3 Fla., 19 ; 9 Md., 174 ; 15 id., 12 ; 14 id., 227 ; 17 Minn., 308 ; 6 Nev., 90 ; 5 La., 17 ; 7 Bush (Ky.), 248 ; 30 Wis., 394 ; 34 Iowa, 41. The doctrine in support of this is found in the English cases. 6 Q. B., 214 (1871) ; 1 H. L., 93 ; 11 House of Lords Cases, 686.

*Gerdine & Critz*, for defendant in error :

There is but one point in this case. It is a new question in this state, and one of importance, however small the amount involved. Is a municipal corporation liable at common law, in the absence of statute, in a private action for an injury to a horse, caused by the neglect or failure to repair bridges or highways within its corporate limits ? The liability of an incorporated city and a county are the same. The boards of supervisors are charged with the duty of keeping the public roads in repair, but the counties are not liable for a failure so to do. Sutton *v.* Board of Police, 41 Miss., 237. It is impossible to draw a rational distinction between cities, counties and towns in this particular. It is competent to give towns and counties powers and privileges as large as those granted to cities. 4 Am. Rep., 452, 460 ; Detroit *v.* Blackby, 21 Mich., 84. Dillon says the ground for the distinction is not as clear as could be desired. 2 Dillon Mun. Cor., § 785. They differ from towns and counties only in the extent of their powers and duties. 4 Am. Rep., 452, *supra.* The municipal authorities are public servants, and not agents of the corporation. In case of a vacancy in any office in West Point, the governor fills the office as in state and county offices. 41 Miss., 237 ; 2 Dillon Mun. Cor., § 785. On this point, almost three-fourths

of the decisions cited by Dillon are New England decisions, and based upon statutes, and not applicable to this case.   2 Dill. Mun. Cor., §§ 786–89, and authorities.   The same argument applies to Iowa, Wisconsin, Massachusetts, Maine, Illinois, New Hampshire, Pennsylvania and others.   Collins v. Council Bluffs, 32 Iowa, 324 ; Cook v. Milwaukee, 24 Wis., 270 ; Billings v. Worcester, 102 Mass., 329 ; 2 Fairfield (Me.), 246 ; 8 Metcalf (Mass.), 388 ; 2 Appleton (Me.), 246 ; 2 Shepley (Me.), 198 ; Chicago v. Gallagher, 44 Ill., 295 ; Rapho, etc., v. Moore, 68 Penn. St., 404 ; Conway v. Jefferson, 46 N. H., 521 ; Commissioners v. Martin, 4 Mich., 557 ; Providence v. Clapp, 17 How. (U. S.), 161 ; Stanton v. Springfield, 12 Allen, 566 ; Shea v. Lowell, 8 id., 136 ; Payne v. Lowell, 10 id., 147 ; Johnson v. Lowell, 12 id., 572 ; Gilbert v. Roxbury, 100 Mass., 185 ; Nason v. Boston, 14 Allen, 508 ; Luther v. Worcester, 97 Mass., 268 ; Hutchins v. Boston, 97 id., 272 ; Stone v. Hubbardston, 100 Mass., 49 ; Cook v. Milwaukee, 1 Am. Rep., 183.

Judge COOLEY says : There is an implied contract on the part of the city in accepting its charter, that it will keep in good repair all streets, bridges, buildings, etc., submitted to its care by such charter.   In support of this position he cites the rule as established by English authorities, but in the English cases there had been certain rights and privileges granted to the corporators, such as constituted a private benefit to them, and these benefits were a sufficient consideration for the demand made upon them by the government, that they should keep in repair their houses,   *   *   etc.   9 Am., 345–7 ; Waltham v. Keneper, 8 id., 652 ; 55 Ill., 346 ; 11 Am., 65 ; 58 Ill., 297.   Sound reasoning is never at variance with itself, and how counsel for appellants can take in the conflicting arguments of their authorities, and still claim to hold a logical position in the case, we are not able to see.

The weight of authority is in our favor.   The charge of malfeasance against the city is farfetched and insufficient.   In fact, the statement of the cause of action shows simple negligence on the part of the city.   The mere charge of malfeasance avails

nothing, since the facts fail to substantiate the charge. A city is not liable in a private action, to an injured person, for neglect or failure to repair the public highways. To render municipal corporations liable to private actions for omissions to perform corporate duties imposed by general law on all cities and towns alike, and from the performance of which they derive no benefit in their corporate capacity, an express statute is doubtless necessary. 3 Am. Rep., 487–90 ; Oliver *v.* Worcester, 102 Mass., 489 ; 4 Am. Rep., 452–60 ; Detroit *v.* Blackby, 21 Mich., 84; 1 Am. Rep., 183 ; Cook *v.* Milwaukee, 24 Wis., 270 ; 3 Harr. (N. J.), 108.

SIMRALL, J., delivered the opinion of the court.

All the members of the court concur in the opinion on the merits, but differ on the question of jurisdiction.

I shall confine myself exclusively to the consideration of that subject. The proposition may be stated in this form : Does the constitution confine the civil jurisdiction of justices of the peace to matters of debt, pecuniary demands arising *ex contractu*, or may the legislature, within the limit prescribed in the constitution, confer jurisdiction to hear and· determine causes for the recovery of personal property, or damages for injuries to the same, or for the recovery of damages for torts and trespasses generally ? The power of the legislature to pass § 1302 of the revision of 1871 (except so much of it as relates to " actions for the recovery of debts " ), is directly involved.

It will be profitable in this discussion to fix in the mind a clear conception of the plan of organizing the judicial power in the constitution. For reading the language of that instrument on this subject, we must have reference to that system of jurisprudence, and the constitution of its tribunals, from which ours has been derived. We find in Great Britain that there were certain superior courts, of original common law jurisdiction ; a court of chancery, with cognizance in all matters of equity, and certain inferior courts, with cognizance of petty suits. The people of this country, who inherited the common law, have always been

accustomed to the administration of justice in tribunals, constituted in the main, on the model of these prototypes. We have always had in territorial times, and after the organization of the state in 1817, under each of the three constitutions, a circuit court of original common law jurisdiction, civil and criminal, which stood in the place of, and represented the judicial power of the three great courts of Westminster Hall. In Planters Ins. Co. v. Cramer et al., 47 Miss., 207, speaking of the circuit court, it is said : " Under our judicial arrangement (it) is a superior court of original common law cognizance in the scope and extent of its powers, nearly analagous to the courts of Westminster, and may in a proper case grant a writ of prohibition to any inferior court," * * etc.

The courts of chancery have full jurisdiction over all matters of equity.

Justices of the peace had at common law no civil jurisdiction whatever. The grant of such authority is purely of American origin, and results from positive law. It has grown out of the necessity and convenience of placing in the several neighborhoods, some depository of judicial power to try and decide petty suits speedily, and at little expense. To that large class of every community whose transactions are small, and whose means are limited, it would amount almost to a denial of justice not to provide some judicial magistrate near at hand, to hear and decide petty controversies, without the delay and expense incident to the superior courts. That want has been met in this country by giving to justices of the peace a limited jurisdiction.

In organizing the judicial deparment, the history and sentiments of the country would logically point out a system founded on the plan which I have sketched. From these general observations I pass to a general examination of the words used in the constitution to arrange and distribute the judicial power. They should not be interpreted in a narrow sense, but be so read as to give full and complete effect to the plan, and so as to give harmony, and the avoidance of conflict between the several courts.

The 64th section of the 6th article is: "The circuit courts shall have original jurisdiction in all matters, civil and criminal, in this state." Dwelling a moment on the language, it is broad enough to embrace suits at common law as well as in equity — "all matters civil." But we know that the purpose was to create a court of common law cognizance, and we, therefore, give that import only to the words. That is plain, from the history of the past as well as from the subsequent sections of the same article. The 16th section provides "for the establishment of chancery courts, with full jurisdiction in all matters of equity," etc. Reading the two sections together in the light of history, and we have a superior court of original common law jurisdiction, and a court of chancery with full jurisdiction in all matters of equity. The last clauses of the 16th section vest in the same court cognizance "in matters testamentary of administrations," and other subjects formerly committed to the probate court. These courts, together with the jurisdiction committed by the 23d section to justices of the peace, complete the judicial system of the state as now established, except, perhaps, some *quasi* judicial authority lodged on the boards of supervisors.

The circuit courts and the chancery court were designed to administer justice according to their respective modes of procedure in all the more important suits. The justices of the peace were intended to have a restricted and subordinate jurisdiction, limited by the amount in controversy. An analysis of the 23d section will disclose, that the framers of the constitution dealt with this functionary as a well known magistrate in our system of jurisdiction. The language is: "A competent number of justices of the peace shall be chosen in each county," etc.

"The jurisdiction * * shall be limited to causes in which the principal of the amount in controversy shall not exceed $150." As if the constitution had said to the legislature, provide for the election of these magistrates in the several districts of the county and in addition to the judicial power which they had at common law, as conservators of the peace, confer upon them also, judicial

authority over civil causes also within the limit named.  The language is very distinguishable from that used in the 14th section in relation to the circuit court.  In the latter, the words are : " In all matters, civil and criminal."  That is to say, the legislature may confer cognizance in " causes " (civil causes), and it is left to its discretion to select the " causes " (the subjects).  The legislature is not compelled by the mandate of the constitution, to give the jurisdiction over all civil causes within the amount limited.  But it is referred to its wisdom to select the subjects.  The clause puts a restriction on the legislature, and that really was its purpose.  That is accomplished by naming a maximum : " The principal of the amount in controversy shall not exceed $150."  Not the "principal" of the debt, but the " principal " of the amount.  Without regard to the incident, as interest for the detention of the debt, or damages for the detention of the house or other property.  The idea was to avoid the suits of a shifting jurisdiction, as under the constitution of 1817, where the words were, " amount in controversy," as illustrated in the case of Planter's Bank v. Conson, 6 How., 397.  Whatever the cause of action, whether a chattel, damages or debt, the principal of the amount in controversy shall not exceed the limit.

When, therefore, the legislature has selected the subjects; within the maximum of value, then all other common law jurisdiction in civil matters pertains to the circuit court.  The constitution intends the legislature shall consult the convenience and necessities of the people in apportioning the jurisdiction of the justice of the peace.  " Causes " is a broad term, and includes as well suits for a chattel, for a tort, as for a debt.  The reason is just as urgent, that the magistrate of the neighborhood should decide a controversy about the ownership of a hoe, a rake or a pig, as about a debt.  Professional experience will attest that no more legal acumen is necessary to settle a dispute about the one than the other.  If the rights of the parties are intricate or doubtful, appeals give access to a more learned tribunal.

To put a narrow and rigid interpretation on the 6th article of

the constitution, constructed out of a philological criticism of the language, would involve our judicial system in confusion and mar its efficiency and harmony.

In determining whether the circuit court has cognizance of a particular suit we must bear in mind that it is a superior court of original jurisdiction over all civil matters, and the inquiry is, has the particular subject been excluded and cognizance been bestowed on some other court? When we consider the authority conferred on the justice of the peace, we must remember, that from the earliest organization of the territorial government he has had a narrow civil authority conferred by the statute, and with this fact before us, read the 23d section. We find the section to be a literal transcript from its original in the constitution of 1832, except that the jurisdiction may be increased in amount.

Perhaps we can accurately express that rendering of the constitution which has been accepted by the profession, the practice of the political departments of the government and the people, when we say that civil jurisdiction of the circuit court begins where that of justice of the peace ends. When the legislature has declared the subject within the limit, then the residium of all other original common law judicial power belong to the circuit court, I mean, of course, as the courts are now constituted, and until the legislature shall create "inferior courts." If it be not so, it would be difficult to defend much of the jurisdiction of the circuit court, which up to this time has never been seriously questioned. To give an absolutely literal interpretation to the final clause of the 14th section would increase the embarrassment. The 23d article intends that the legislature shall regulate appeals from justices of the peace. Following and adopting previous statutes, the Code of 1871 allows appeals in cases when the amount exceeds $50 to the circuit court, and a trial "de novo." If it should be held that the circuit court can only try civil causes "when the principal amount in controversy exceeds $150," what becomes of its jurisdiction in cases of prohibition, in many mandamus cases, and suits to secure possession of land, where the right asserted is inca-

pable of pecuniary measurement. The alderman of an incorporated town, the director in a banking or railroad company, or other private or public corporation, has no other remedy for an unlawful expulsion from office by which he may be restored or admitted, except the proceeding by mandamus, and yet there is no pecuniary salary or emolument pertaining to these places. The offices are of no pecuniary value. The writ of prohibition can only proceed out of a superior court of common law, to restrain an inferior tribunal from exceeding its jurisdiction. Planters Ins. Co. v. Cramer et al., 47 Miss., *supra*. And that authority in no wise depends on any question of amount in controversy, but on the right rather of a superintendency over inferior tribunals, to prevent a transgression, and abuse of their limited jurisdiction. It has never been necessary to aver and prove the value of land sued for, in ejectment, as an element of jurisdiction. Without pursuing this line of argument and illustration further, it leads to the conclusion that the true rendering of the 14th and 23d sections is, that the legislature may asssign to justices of the peace cognizance of subjects of litigation which may be measured by a calculation of amount in money, as the value of a horse, of cotton, damages for an injury, or a debt not to exceed $150, and that when the legislature has assigned the subjects, or causes of action within the limit, it excludes the jurisdiction of the circuit court; and all else, not so specifically assigned, belongs to that court. To hold at this day, in the light of legislative and judicial history, since 1817, that the constitution organizing the judicial power must have a literal interpretation, would bring into grave doubt the validity of several important statutes, and would deny to the legislature the right to confer new jurisdiction on the several courts, as it might judge convenient.

The constitution does not confine the several courts in a straight jacket. When it established a chancery court " with full jurisdiction in all matters of equity," it meant that system of equity jurisprudence, unwritten and positive, which existed in this state in 1869, with all its capabilities of improvement and expansion. It

left the court free to take its share in a wider development of its
peculiar jurisprudence, and to new applications of its principles,
to the shifting transactions of men, and the changing condition of
society, assisted from time to time by legislative enactments. It
meant the system as it then was, and such accessions as would be
made by its natural growth, and the contributions by the legisla-
ture. The system as it was, and as it might grow to be in the
future. The same observation is true of the other clauses of the
16th section in reference " to matters testamentary, administration,
and minors' business," etc. These subjects have been from the
beginning, for the most part, regulated by statutes. . The whole
body of positive law, administered under the constitution of 1832
by the probate court, is now administered in the chancery court.
There is nothing to restrain the legislature from such additions to
these statutes as shall enable the chancery court to do complete
justice in litigations on these subjects. It would be unfortunate
if the boundaries of the court had been so adjusted in the consti-
tution as that the court of chancery could proceed so far in adju-
dicating the rights of a legatee or distributee, and then come to a
final pause, and turn him over to some other court to obtain full
redress. That evil may be obviated by holding that where the
constitution gives jurisdiction of the principal subject matter, the
legislature may allow it cognizance over cognate and incidental
matters, so that by one litigation the whole subject may be termi-
nated. The statutes allowing the circuit court to entertain a peti-
tion for discovery in aid of a pending suit, and allowing the sub-
jection of the separate estates of married women to the satisfaction
of certain debts, fall in this category. So does the statute to en-
force the mechanic's lien.

That jurisdiction is not vested in the several courts as now
established, in the sense of being exclusive, is manifest from the
1st section of the 6th article, which confers power on the legisla-
ture to establish inferior courts, for since every legal controversy
is now litigated in one or the other of the courts as now constituted,
it would follow that whatever judicial power an inferior court

hereafter established might have, must be subtracted from one or the other of the courts now in existence. The reflection which I have bestowed upon this question has engendered the conviction that in one or more recent discussions, we have placed upon the words of the constitution an interpretation too literal, which, if followed to its logical results, will be attended with unfortunate consequences.

In accordance with the American practice, justices or the peace, in this state, have always exercised a limited civil cognizance. By the territorial act of 1799, it is extended to pecuniary demands under eight dollars. By the act of 1814, it was enlarged to sums not over fifty dollars. The constitution of 1817 limited the jurisdiction in civil cases "to causes in which the amount in controversy shall not exceed fifty dollars." Sec. 8, art. 5.

The only change made by the constitution of 1832 in this language was in the word " principal " of amount in controversy. This became necessary, as we have seen, to give fixedness to the jurisdiction, so that it would not be dependent, as often happened, on one incident, as interest, etc. These words were continued in the constitution of 1869. The revised statutes of 1822 still further extended in the line of previous legislative cognizance of pecuniary demands up to the constitutional limit. The revised code of 1857, in addition to the subjects embraced in former statutes, included, also, " actions for the recovery of personal property, or of damages for trespasses by stock, or any injury to personal property, when the amount of damages claimed, or value of the property, shall not exceed fifty dollars." Rev. Code, 1857, p. 405, art. 7. This review of legislation teaches two lessons : first, that there has been a gradual increase of the jurisdiction in amount; and, secondly, that the legislature has construed the constitutions, in the sense of restricting their power in only one direction, and that is as to the amount, leaving it to their discretion to declare the subjects.

It will be noticed that the act of 1857 excludes from the judicial authority of the justice torts to the person and trespasses on

real estate. The legislature, under the constitution of 1869, proceeds on precisely the same interpretation. The code of 1871 is broader than that of 1857, but still withholds some subjects from this magistrate; for instance, suits to recover land. The observation of the supreme court of the United States, in Stuart v. Laird, 1 Cranch, 95, in answer to the objection that the judiciary act of 1869, was unconstitutional, because it assigned circuit duty to the judges of the supreme court, are peculiarly appropriate in this connection. Said the court: "To the objection, which is of recent date, it is sufficient to observe that practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has, indeed, fixed the construction. It is a contemporaty interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled." To the same effect are the judgments of the state courts in Moers v. City of Reading, 21 Penn., 188; People v. Green, 2 Wend., 266, 274. Since 1857, no case has been brought to the appellate court questioning the jurisdiction, until the present term of this court. For twenty years the statutes have been in force, acquiesced in by the people and legal profession, including the judiciary. As late as 1837, this court, in Askew v. Askew, 49 Miss., 306-7, recognized the validity of this legislation, as embodied in § 1302 of the code of 1871. I am of opinion that it is competent for the legislature to confer on justices of the peace cognizance of the subjects embraced in § 1302 of the code of 1871, and that this suit was rightfully brought in the justice's court.

TARBELL, J., concurring :

The jurisdiction of courts of justices of the peace is a question of the very first importance, in every point of view. In submitting my individual views, I shall not pursue the discussion in its length and breadth, referring rather to the arguments of counsel and the opinions of my associates.

The constitutional provision involved is one which should be

liberally construed.  It is in the interest of the people.  These inferior tribunals may well be styled the "people's courts."  If a liberal construction were asked in support of some power in conflict with popular rights, a strict construction might be invoked with more propriety.  In this instance, a liberal construction is for the benefit of the mass of the citizens of the state of all classes.

But a liberal construction conforms to the practice in this state from its organization.  Upon contemporaneous construction and long continued acquiescence, reference is made to Cooley on Const. Lim., 70.

The constitution of Alabama is substantially like our own, and its provisions have been construed by the courts of that state. See Pearce v. Pope, 42 Ala., 319, where the rule is declared which should obtain here:  "The object of the constitutional provisions before referred to was not to confer power upon the legislature, nor to vest jurisdiction in justices of the peace, nor to provide for its exercise.  It was to place a restriction upon the legislature in conferring the jurisdiction — to provide a maximum as to its extent.  This being effected, it was left to legislative discretion to fix its extent, in the different classes of civil cases."

In the consideration of this case, I looked into the constitution and statutes of every state in the union.  The result is that in our state only is this jurisdiction limited to matters of contract.  In all, this jurisdiction and the special duties devolved on justices of the peace, have steadily been enlarged, so that in some of the states these courts have cognizance of actions on contract up to $300, and to a less sum in actions of tort alike to real and personal property, and even to the person, including replevin, while in others, actions of tort are limited and carefully restricted by specific legislation.  Justices of the peace may even grant an injunction in their own courts in a few, perhaps one or two, of the states, while in town and county affairs, and in county courts, in several states, they are charged with the most important duties.  And this jurisdiction and these duties have been constantly extending

as the people and the country have advanced in intelligence and wealth.

The former constitution of this state as to justices of the peace is precisely the same with the provision of the present on this subject. The revised code of 1857 (p. 405, art. 7) confers jurisdiction on justices of the peace "in all civil actions for the recovery. of damages for the breach of any contract, or for the recovery of personal property, or of damages for trespasses by stock, or any injury to personal property, when the value of the property (sought to be recovered), or the amount of damages claimed shall not exceed," etc. This was the practical construction of the limitation of the then constitution. The adoption of our present constitution must be regarded as a sanction of the view taken of the former. To this effect, on several adjudications of this court, see particularly Askew v. Askew, 49 Miss., 301. See also, Cooley Const. Lim., 66. It is true that under the code of 1857, an action of replevin was provided for only in the circuit court, but detinue, trover, trespass, etc., were authorized to be heard by justices of the peace, as replevin might have been under the construction given to the constitution. The code of 1871 follows that of 1857, and extends it only in detail, not in principle. It observes the constitutional limitation exactly, by confining the jurisdiction to "causes" in which the principal subject of controversy shall not exceed $150.

By reference to the constitution of 1817, it will be seen that the terms "matter," "sum," and "amount," were used as equivalent expressions. Art. 5, §§ 4, 8. The constitution of 1832 adds "principal," to avoid the oft occurring inconvenience of the mere incident ousting the jurisdiction. The constitution of 1869 employs the comprehensive word "amount" as equivalent to matter or thing, and this comports with reason in providing for inferior magistrates who shall have power to decide the frequently occurring controversies arising about matters not exceeding $150, as the chief, or main, or "principal" thing in dispute. There is no reason for allowing a justice of the peace to decide between

parties in a controversy about, or arising out of, a contract, and refusing to allow him to decide about the title, or a trespass to a hog, a cow, or a horse, or other personal property. If more legal knowledge is required in one than in the other, it is in the former. The larger part, perhaps, of the population of the state, including both colors, have, in point of value, but unimportant matters of controversy. To compel this large class to go into the circuit courts to redress a trespass to crops, or to stock, or other property, not involving damages beyond a few dollars, would be practically to them a denial of justice, by reason of the costs.'

The language of the constitution is not that this jurisdiction shall be limited to causes arising out of contract, but to " causes," a comprehensive term embracing every sort of suit or action in which a right may be asserted.    To limit it to causes upon contracts would be to interpolate the constitution by qualifying the comprehensive term it employs.    " Principal " is used in its commercial sense, in distinction from interest, or profits, or damages, which are incident.    " Amount " does not confine it to contracts. This word contains the idea of rising up, of size and extent ; and as we employ dollars as the measure of value, the yard-stick, or weight by which we try the value of all things as greater or less, it is employed in the constitution to indicate that justices of the peace shall not judge of greater matters than those " causes " in which the "principal" (apart from incidents) does not exceed $150.    These observations apply alike to the several sections of the constitution involved.    The only difference in language between the two sections (art. 6, §§ 14, 23) is, the omission in the former of the words " of the " before " amount," whence it seems that " principal " is used as an adjective in the former section and as a noun in the latter ; but the sense is the same in both.    The reason for using the word " principal " was to avoid the ousting of the jurisdiction by reason of the incident, whether interest, damages, or costs.    Replevin for a cow worth $40, and damages for detention ; this is a " cause."    The principal (main, chief) of the amount (size, value) in controversy is $40.    Damages, if

any, are an incident to the principal thing (amount) in controversy. This " cause," not involving as its principal thing more than $150, is within the limit of the constitution. Jurisdiction of the action of ejectment is within the legislative discretion.

Such are my views briefly stated of this interesting question. Upon the other question, and upon which this case must be reversed, I concur with Chief Justice Peyton.

PEYTON, C. J., dissenting.

This was an action brought by Robert Bell, in a court of justice of the peace of Colfax county, against the city of West Point, to recover $150 damages for an injury to the plaintiff's horse in falling through a bridge in said county, resulting from the neglect and failure of the defendant to keep in repair said bridge on Main street, within the corporate limits of said city.

Judgment was rendered by the justice of the peace for the defendant on the 30th day of June, 1875, and from this judgment the plaintiff appealed to the circuit court, which dismissed the cause, and hence the case is brought to this court by writ of error on the part of the plaintiff, who here assigns for error the action of the court below in dismissing the cause, and in holding that the defendant was not liable for the injury complained of.

From this short statement of the main facts in this case, it will be readily perceived that there are two important questions presented for our investigation and decision and the solution of these questions will necessarily involve an inquiry into the extent of the civil jurisdiction of justices of the peace, and the liability of a municipal corporation to an action by an individual who sustains special damage from a nuisance maintained by it.

The first of these questions, as to the extent of the civil jurisdiction of justices of the peace, has never yet been fully investigated and definitely determined by this court; and the other, as respects the liability of municipal corporations to actions at the suit of individuals for special damages, resulting from nuisances, is one of the first impressions in this court. We have, therefore,

given to these questions that deliberate consideration to which their magnitude and importance entitled them.

With respect to the first question, it will be found by reference to the constitution, that from the origin of state government in the distribution of judicial power, the civil jurisdiction of justices of the peace has been prescribed and limited by the paramount and organic law of the state, both as to the amount and subject matter of litigation.

The constitution of 1817, under which our state government was organized, provides in the 8th section of the 5th article, that a competent number of justices of the peace shall be appointed in and for each county, in such mode and for such term of office as the legislature shall direct; their jurisdiction in civil cases shall be limited to causes in which the amount in controversy shall not exceed fifty dollars. The amount in controversy has been determined to be the debt or sum demanded, including the principal and its incidental interest; and thus it will be seen that the jurisdiction will be made to depend, in many instances, upon the amount of interest which has accrued upon the principal at the time of the institution of the suit, so that a justice of the peace might have jurisdiction at one time, and the next month be ousted of his jurisdiction by the accruing interest on the principal debt, and in this way his jurisdiction was made to fluctuate by the effect of time. To obviate this uncertainty, and to make his civil jurisdiction certain and definite, the 23d section of the 4th article of the constitution of 1832 provides that the jurisdiction of justices of the peace shall be limited to causes in which the principal of the amount in controversy shall not exceed fifty dollars. Under this constitution, the interest, although it may still constitute a part of the amount in controversy as formerly, yet it does not affect or oust the justice of jurisdiction.

In the case of Loomis v. Commercial Bank of Columbus, 4 How., 676, involving the consideration of the question of the jurisdiction of justices of the peace, under the constitution of 1832, Chief Justice SHARKEY, in delivering the opinion of the court,

says: "We assume the position as undeniably true, that all our courts, both superior and inferior, derive their jurisdiction from the constitution, and that they possess only such jurisdiction as is given with the incidental powers necessary to carry out that jurisdiction.  *  *  In addition to this, we maintain the further position that all jurisdiction has been parceled out and distributed by the constitution; none remains ungranted.  It was obviously the design of the convention to create appropriate tribunals for the determination of every matter of litigation.  *  *  The first section of the fourth article of the constitution declares the judicial power of the state to be vested in one high court of errors and appeals, and such other courts of law and equity as are thereafter provided for; and in the same article, we find a portion of that power given to the circuit courts, and another portion to justices of the peace.  The circuit courts have original jurisdiction in all matters civil and criminal, 'but in civil cases only when the principal sum in controversy exceeds fifty dollars.'  This is obviously a limitation on the powers of that court.  It has not, nor can it acquire by the aid of the legislature, jurisdiction in civil cases, when the amount is liquidated under fifty dollars.  The 23d section of the same article provides that a competent number of justices of the peace shall be elected in each county, and that the jurisdiction of justices of the peace shall be limited to causes in which the principal of the amount in controversy shall not exceed fifty dollars.  This is an express grant of jurisdiction, and it is a grant of that residue which was excepted out of the grant to the circuit courts, so that the two sections dispose of the entire jurisdiction of the state in all matters of contract."

The present constitution, adopted in 1869, in sec. 14 of art. 6, provides that the circuit courts shall have original jurisdiction in all matters civil and criminal, within this state; but in civil cases, only when the principal of the amount in controversy exceeds one hundred and fifty dollars; and the 23d section of the same article provides that the jurisdiction of justices of the peace shall be limited to causes in which the principal of the amount in con-

troversy shall not exceed the sum of one hundred and fifty dollars. It will thus be seen that the original jurisdiction of the circuit court in all matters civil and criminal within the state is diminished in civil cases to the extent of the jurisdiction of justices of the peace, which is now limited in matters of contract to causes in which the principal of the amount in controversy shall not exceed the sum of one hundred and fifty dollars. These two grants of judicial power to the circuit courts and justices of the peace, dispose (in the language of the court in the case of Loomis v. The Commercial Bank of Columbus) of the entire jurisdiction of the state in all matters of contract.

The constitution very clearly, in my opinion, limits the jurisdiction of justices of the peace, not only as to the amount, but as to the subject matter. It is limited to one hundred and fifty dollars principal, exclusive of interest, and the subject matter must be contract, express or implied. The civil jurisdiction of justices of the peace is derived from the constitution, and they possess only such jurisdiction as is given, with the incidental powers necessary to carry out that jurisdiction. The limitation of the jurisdiction by the principal indicates a claim founded on contract or arising *ex contractu*, in which interest may accrue. When we speak of principal, we always associate therewith the idea of interest. The constitution contemplates a transaction cognizable before a justice of the peace, in which there may be a principal and interest, or at least a principal sum on which interest may accrue.

The code of 1871, in section 1302, provides that justices of the peace shall have jurisdiction of all actions for the recovery of debts or damages or personal property, where the principal of the debt, the amount of the demand, or the value of the property sought to be recovered, shall not exceed one hundred and fifty dollars. It is believed that that clause of this section which purports to give justices of the peace jurisdiction of actions for the recovery of personal property, is unauthorized by the constitution, and is therefore void. The constitution was intended to set-

tle and determine a certain amount within which this jurisdiction may be exercised. But in a suit for the value of personal property there is no certain criterion furnished as to the value of the property sought to be recovered. This would depend upon the mere opinion of the plaintiff. And what one man might consider as worth only one hundred and fifty dollars, another man may consider as worth two hundred dollars, and thus would be introduced the uncertainty as to the amount to give jurisdiction, which the constitution was intended to provide against and avoid. But it is believed that justices of the peace have no civil jurisdiction of the subject matter in such cases. They may entertain within the proper limits actions of assumpsit, debt and covenant. These are actions in form, *ex contractu*, and depend upon contract, express or implied. They have no civil jurisdiction in actions in form, *ex delicto*, such as trespass, detinue, trover and replevin, and of actions on the case, sounding in damages merely. These actions were clearly never designed by the constitution to be within the jurisdiction of justices of the peace. In England, inferior courts are said to take nothing by implication, or without express grant, because the common law courts possessed general jurisdiction over the realm, and nothing could be taken from them, or given concurrently without an express act of parliament, and that which was not expressly given was supposed to remain with the original depository; but here both the circuit and justice's courts derive their power from the same fountain, the constitution of the state, and to the one is given all that is denied to the other. But the 14th section of the 6th article of that instrument excepts from the general original jurisdiction of the circuit courts jurisdiction in civil cases when the principal of the amount in controversy shall not exceed the sum of one hundred and fifty dollars, and this is conferred by the 23d section of the same article on justices of the peace. The expression in the constitution, of the sum of one hundred and fifty dollars, clearly means an ascertained and liquidated amount in dollars and cents, and not contingent and unascertained damages; and that this relates only to matters of

contract, I will again refer to the case of Loomis *v.* The Commercial Bank of Columbus, where the court say, that the grant of jurisdiction to justices of the peace is a grant of that residue which was excepted out of the grant to the circuit courts, so that the two grants dispose of the entire jurisdiction of the state in all matters of contract.  4 How., 677.

The only thing a justice has to determine is the question of indebtedness, without regard to the technical form of the action, whether in assumpsit or debt.  He is not a common law court. Stier *v.* Surget, 10 S. & M., 154, 158.  This is the first case in which the civil jurisdiction of justices of the peace under the constitution has been fully examined and considered.  The leading rule in regard to the judicial construction of constitutional provisions is a wise and sound one, which declares that in cases of doubt, every possible presumption and intendment will be made in favor of the constitutionality of the act in question, and that the courts will only interfere in cases of clear and unquestioned violation of the fundamental law.  Where, however, the violation of the constitution is clear, it is the duty of the courts to say so.  If the legislative department will infringe on the constitution, the duty of the courts may be arduous and unpleasant, but it is a plain one, regardless of the consequences.  And upon this subject I adopt the language and sentiment of the learned and accomplished Judge Bronson, who held that "it is highly probable that inconveniences may result from following the constitution as it is written.  But that consideration can have no weight with me.  It is not for us, but for those who make the instrument, to supply its defects.  If the legislature or the courts may take that office upon themselves, or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government.  Written constitutions will be worse than useless.  Believing as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of

expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power; some evil to be avoided, or some good to be obtained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it, and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or judiciary in enlarging the powers of government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them."

In the state of Alabama, in the case of Cavender v. Funderburg, 9 Port., 460, it was held that if a contract does not in terms or by necessary implication furnish a rule by which the damages for its breach can be computed, it is a case sounding in damages merely, and the jurisdiction of a justice of the peace is ousted. And in the case of Williams v. Hinton, 1 Ala. (N. S.), 297, it was decided by the supreme court of that state that justices of the peace have no jurisdiction of the action of trover or detinue, although the property converted may be of a less value than fifty dollars. But it may be said that although a party cannot maintain an action in form *ex delicto*, in a justice's court, he may waive the tort and sue in assumpsit in that court. The right of a party in certain cases to waive a tort and sue as in contract is not denied. But no case can be found that recognizes the principle that by waiving the tort a new jurisdiction can be acquired. Where the plaintiff has an election to sue either in tort or in contract, no court can have jurisdiction in assumpsit but one which can give a remedy on the

tort itself, for the reason that the same questions of law arise in each.   Clark *v.* Dupree, 2 Dev., 411, and Mann *v.* Kendall, 2 Jones (Law), 192.

If the value of the property in controversy furnishes the criterion of jurisdiction, there is no reason why a justice of the peace should not entertain an action of ejectment, where the value of the land sued for shall not exceed the sum of one hundred and fifty dollars.

The convention which framed the constitution, knowing that the office of justice of the peace in this country is filled generally by men of good practical sense, but without legal attainments, provided that the jurisdiction of justices of the peace should, in civil matters, be limited to matters of debt, which could be easily understood and adjusted between debtor and creditor, but withheld from their jurisdiction actions of ejectment, trespass, detinue, trover, replevin and case, for the reason that the correct administration of the law applicable to those actions requires more legal learning than is ordinarily possessed by justices of the peace.   The circuit court and that of a justice of the peace have no concurrent jurisdiction.   The original jurisdiction of the circuit court is exclusive in all civil cases, when the principal of the amount in controversy exceeds one hundred and fifty dollars. Under that amount the justice of the peace has exclusive jurisdiction, where the sum is ascertained or liquidated, but not where it is contingent and uncertain.   This brings me to the consideration of the question of the liability of municipal corporations to actions of individuals for special damages arising from nuisances. A nuisance is something done or omitted to be done, which has the effect of prejudicially and unwarrantably affecting the enjoyment of the rights of another person.   Wood on Nuis., 6.   The neglect to repair a bridge or highway renders the person or corporation, whose duty it is to make the repairs, liable to indictment as for a nuisance.   7 Bacon's Abr., 232.   It seems now to be well settled, both in England and in this country, that a municipal corporation is liable not only to an indictment for a pub-

lic nuisance maintained by it, but is also liable for damages at
the suit of an individual who sustains special damages therefrom.
But in order to uphold a private action, the injury resulting from
the nuisance must be special and particular, and not such as is
sustained by all the public in common.   If it allows its streets to
remain out of repair, or if it neglects to abate a nuisance injuri-
ous to the health of its citizens, which it has the power to remove,
or if it permits any public nuisance to exist upon its property, it
may be indicted and punished the same as an individual.   Wood
on the Law of Nuis., 779, sec. 743.   This doctrine is clearly and
distinctly announced by the court of last resort in England, in the
case of the Mayor of Lyme Regis v. Henley, 2 Clark & Fen., 331.
In that case it was said:   1. That the corporation must be under
a legal obligation.   2. That such obligation must be matter of so
general and public concern that an indictment would lie against
the corporation for nonrepair; and, 3. That the place in question
is out of repair; and lastly, that the plaintiff has sustained some
peculiar damage beyond the rest of the king's subjects, by such
want of repair.   It may fairly be deduced from the many cases
upon this subject decided by the courts of this country, that in
the absence of any express statute imposing the duty and declar-
ing the liability, municipal corporations proper having the powers
ordinarily conferred upon them respecting bridges, streets and
sidewalks within their limits, owe to the public the duty to keep
them in a safe condition for use in the usual mode by travelers,
and are liable in a civil action for special injuries resulting from
neglect to perform this duty.   Such a duty and liability are con-
sidered to exist without positive statute, when the following con-
ditions concur:   1. The place in question, whether bridge, side-
walk or street, must be one which it is the duty of the corpora-
tion to repair or keep in a safe condition, and this duty, if not
specifically enjoined, must arise upon a just construction of the
charter or statute applicable to the corporation.   2. This duty or
burden must appear, upon a fair view of the charter or statutes,
to be imposed, or to rest upon the municipal corportion as such,

and not upon it as an agency of the state, or upon its officers as independent public officers. This, however, in general appears sufficiently where the municipality sought to be made liable exists under a special charter or general act which confers upon it peculiar powers and privileges as respects streets, their control and improvement, not possessed throughout the state at large under its general enactments concerning ways. 3. The power to perform the duty of maintaining the streets in a safe condition, by authority to levy taxes or impose local assessments for the purpose, must be conferred upon the corporation. Weightman *v.* Washington, 1 Black, 39; 5 Bingham, 91; 3 Barn. & Adol., 77, and 2 Cl. & Fen, 311; Nebraska City *v.* Campbell, 2 Black, 590. Where a city corporation, with control over streets and power to levy taxes to keep them in repair, which left a bridge on a street over a creek defective and unsafe for want of side railing, was held liable for damages happening in consequence. 2 Dill. on Mun. Corp., 915. The corporation is liable for damages arising from the omission of the duty to repair, as well as to those arising from some act done by it. Davenport *v.* Ruckman, 37 N. Y., 568. And willful neglect is not essential to liability. Dillon says, that where the duty to keep the streets in repair is, in terms, enjoined upon the corporate authorities, and they are supplied with the means to perform it, there is little difficulty in holding the corporation liable, on the general principle of the law, without an express statute declaring liability to a civil action by any one specially injured by its neglect to discharge this specific duty. But where the duty to repair is not specifically enjoined, and an action for damages caused by defective streets is not expressly given, still, both the duty and the liability, if there be nothing in the charter or legislation of the state to negative the inference, has often been properly deduced from special powers conferred upon the corporation to open, grade, improve and exclusively control public streets within their limits, and from the means which, by taxation and local assessments, or both, the law places at the disposal of the municipality to enable it to discharge its duty.

290          BELL vs. CITY OF WEST POINT.          [Sup. Ct.

Dissenting opinion.

Where the duty to keep the streets in safe condition rests upon the corporation, it is liable for injuries caused by its neglect or omission, as before stated, to keep the streets in repair, as well as for those caused by defects occasioned by the wrongful acts of others; but as in such case the basis of the action is negligence, notice to the corporation of the defect which caused the injury, or the facts from which notice thereof may reasonably be inferred, or proof of circumstances from which it appears that the defect ought to have been known and remedied by it, is essential to liability; for in such cases the corporation, in the absence of controlling enactments, is responsible only for reasonable diligence to repair the defects or prevent accidents after the unsafe condition of the street is known, or ought to have been known to it from the notoriety of the defect, or to its officers having authority to act respecting it. It is also essential to liability that the plaintiff should have been using reasonable or ordinary care to avoid the accident, or in other words, he must be free from any such fault or neglect on his part, as will in actions for negligence defeat a recovery.

The 11th section of the original act of incorporation of the town of West Point provides that the mayor and selectmen shall have power to pass all by-laws necessary to preserve the health, and to prevent and remove nuisances within the same; and the 12th section confers the power on them to improve, preserve and keep in good repair the streets, sidewalks and public square of said town; and the 11th section of the act, to amend the charter of said town, gives to the city authorities the entire control over the streets of the city of West Point; and they have the power and authority to levy and collect taxes for street purposes; and according to the principles above laid down, it was the duty of the city to keep the streets free from obstructions and in good condition so as to be safe for persons and property passing thereon. Bridges are usually a part of the street or highway, and in this country the power of municipal corporations to build them, and their authority over them, are wholly statutory, and their duties in respect to them are either prescribed by statute or spring from their powers. There

is no common law responsiblity on municipal corporations, in respect to the repair of bridges within their limits; but where bridges are part of the streets, and built by the municipal authorities under powers given to them by the legislature, they are liable for defects therein, on the same principles and to the same extent as for defective streets. But actions against municipal corporations by individuals for special damage resulting to person or property from defects in streets or bridges. must, under our system of jurisprudence and judiciary system, be brought in the circuit court, and cannot be maintained in courts of justices of the peace.

The justice of the peace having no jurisdiction of the case, the the circuit court did not err in dismissing it.