## MESSENGER v. BOARD OF COUNTY COMMISSIONERS OF CONVERSE COUNTY.

### (No. 648.)

ANIMALS—TRANSPORTING OUT OF STATE—INSPECTION—FEES—STATUTES — CONSTRUCTION — INSPECTION LAWS — OBJECT — RIGHT OF SHERIFF TO RETAIN INSPECTION FEES.

1. In a statute enacted in 1901 providing for an inspection of horses about to be transported or driven out of the state, Section 4 declared that the inspection should be free of charge to the owner, and Section 8 required that a fee of 15 cents per head be charged for all horses inspected, without any express provision as to the disposition of the inspection fees. In 1903 Section 4 was amended and the provision aforesaid for making the inspection free of charge was omitted. In 1909 a new statute on the subject was enacted requiring the inspection fees to be paid into the general fund of the county treasury. *Held,* (1) That the said amendment of 1903 did not disclose the intention of the legislature one way or the other as to the ownership of the inspection fees, but merely left it certain that an inspection fee was to be charged. (2) That the act of 1909 had no effect upon the construction of the former statute relative to the ownership of the fees, for the legislature might at one time allow the sheriff to retain the fees and at another require them to be paid into the county treasury, and it was provided by the later act that

the repeal of the former should not affect the status of any action or proceeding in the courts relative to fees for previous inspections.

2. In the constitutional provision that in addition to his salary a sheriff shall be entitled to receive from the party for whom the services are rendered in "civil cases" such fees as may be prescribed by law, the term "civil cases" is to be broadly construed as inclusive of all "cases" not criminal, and as meaning a legal proceeding of some nature for the protection or enforcement of a private right or the redress of a private wrong.

3. The statute (Laws 1901, Ch. 79) providing for an inspection of horses about to be transported or driven out of the state, and the making, filing and publication of a record of all such inspections, giving the name of the owner and shipper, the several brands, the number of the car, and destination of the shipment, was passed for the protection of the public against fraud or crime in relation to a class of property that may more or less easily, according to circumstances, be wrongfully appropriated and removed beyond the state without detection, and is an inspection law, notwithstanding that its object may differ materially from that of inspection laws generally.

4. It is proper for a state, as incident to its power to enact valid inspection laws, to impose a reasonable charge for the purpose of defraying the expenses of the inspection; such charge or fee being justified on the ground that the same is a regulation expense, imposed for the purpose of laying the burden of executing the law upon the property involved.

5. Although inspection fees are paid by the party whose duty it is to have the property inspected, the services of the inspecting officer are rendered distinctively for and in the interest of the public.

6. The fact that under the law requiring an inspection of horses about to be transported or driven out of the state, the shipper or drover is enabled, upon satisfying the inspecting officer of his right to do so, to proceed lawfully with the transportation or removal of the animals does not constitute the act of the inspecting officer a service rendered the shipper or drover, in the sense in which the services of a sheriff in a civil case are referred to as rendered for a party thereto.

7. Under the statute of 1901 (Ch. 79) providing for an inspection of horses about to the transported or driven out of

the state, making the sheriff the inspecting officer, and requiring him to charge and collect from the owner or shipper a fee for each animal inspected, the acts of the sheriff, as such inspector, were not services rendered in civil cases, within the meaning of the constitutional provision allowing the sheriff to receive as compensation, in addition to his salary, only such fees as may be prescribed by law for services rendered to a party in civil cases, and, therefore, such inspection fees belonged to the county and were required to be paid into the county treasury.

[Decided June 14, 1911.]                    (117 Pac. 126.)

ERROR to the District Court, Converse County.; HON. RODERICK N. MATSON, Judge.

The material facts are stated in the opinion.

*H. Donzelmann* and *Kinkead & Mentzer,* for plaintiff in error.

The right of the sheriff to the fees in question primarily depends upon the meaning of the term "civil cases" as used in Section 2 of Article XIV of the Constitution. We contend that said term was used in its ordinary meaning and acceptation, and that it should not be given a strained or contracted construction. By the statute making the sheriff the inspecting officer, and requiring him as such to inspect horses about to be transported and driven out of the state, the legislature imposed upon the sheriff a service in a civil matter, as distinguished from a criminal case. It is not our contention that the legislature may not impose a duty upon a sheriff in a civil matter without providing adequate compensation therefor. But when the sheriff is required to perform services in civil matters, and a compensation therefor is fixed, then the constitution declares that the fees so provided shall belong to the sheriff, and neither the county nor state could be made the beneficiary thereof. It is not a question whether the services were rendered for the county, nor whether the legislature intended that the sheriff should retain the fees, for if such fees come within the meaning of the term "services per-

formed in civil cases" as used in Section 2 of Article XIV of the constitution, then the fees must belong to the sheriff, and cannot be lawfully claimed by the county.

"Civil cases," as used in the constitutional provision aforesaid, must be held to include all matters coming within the duties of a sheriff which are distinguished 'from criminal matters, and it cannot be given the restrictive meaning of civil action in court. The term is a much more comprehensive one than the expression "civil actions." (Carpenter v. Jones, 121 Cal. 362; *In re.* District Atty., 23 Fed. 26; U. S. v. Volz, 14 Blatch. 15; Scott v. Lasell, 71 Ia. 180.) A different rule should apply in construing provisions of the constitution than in the construction of statutes, for the reason that such a document is one that has been given careful consideration and calculated for permanent endurance. (Wolcott v. Wigton, 7 Ind. 44; Greencastle v. Black, 5 Ind. 557; Newell v. People, 7 N. Y. 9; Cooley's Const. Lim. (6th Ed.) 75; 8 Cyc. 731.) A constitution should be given a practical interpretation and one that will give it life and usefulness, if such a meaning can be given to it without violence to the words employed. But the words and terms of a constitution, like those of a statute, are to be interpreted and understood in their most natural and obvious meaning, unless the subject indicates or the text suggests that they have been used in a technical sense. (Miller v. Dunn, 72 Cal. 462; People v. May, 3 Mich. 598; Charleston v. Oliver, 16 S. C. 47.) What would be the situation if the constitutional provision aforesaid is so construed as to exclude all services, which may now or hereafter be imposed upon the sheriff in other than "civil actions"? The sheriff is in some cases required to preside over juries in condemnation proceedings, acts of fence viewers, may foreclose chattel mortgages and trust deeds by notice and sale, and in numerous other ways is authorized to act in matters than those growing out of "civil actions." Can it be said that the fees collected for such services would belong to the county, or that any part of such fees should

be paid into the county treasury? Yet, such would be the logical conclusion if the term "civil cases" as used in the constitutional provision aforesaid is to be restricted to "civil actions." Section 1113, Revised Statutes 1899, provides for fees to be paid to the sheriff for the drawing of jurors and talesmen, and yet that is a service performed peculiarly for the county. This is a legislative construction of that which the constitution has intended to be compensated for by the sheriff's salary. It interprets the constitution as allowing the sheriff all fees in all civil matters, whether the service be performed for county or an individual. A practical construction by the legislature of a doubtful constitutional provision will be followed by the courts if that can be done without violence to a fair meaning of the words used. (State v. Stingley, 24 Utah, 25; McPherson v. Secretary, 92 Mich. 377.)

The amendment in 1903 of the Act of 1901 is quite significant, and lends force to the proposition that the legislature intended the sheriff to be paid for his services as inspector, and that the fees provided for were collected for the purpose of re-imbursing the sheriff for his personal services and expenses. Again, Section 8 of the act provides that the fee shall be "in full compensation" for all services rendered in making the inspection. This indicates that it was intended to be received by the sheriff as compensation. It is true that the statute finds its justification in the police power of the state, yet the services to be performed by the inspector are not performed for the county. They may result in benefit to the county indirectly, and may serve to discover and punish crime, but the services are performed for the shipper, since he cannot ship his horses from the state until they have been inspected, and he has received a certificate to that effect. The shipper demands the services, receives the exclusive benefit thereof, and pays the fee provided by the statute. It is a purely civil matter between the shipper and the sheriff. It is therefore submitted that the fees earned by the sheriff

under the statute come within the meaning of the constitutional provisions allowing him to receive fees in civil cases in addition to his salary. If the sheriff is not entitled to retain the fees so collected, then by the same reasoning he would be compelled to personally bear all the expenses in performing the acts of inspection. But it is evident from Section 1116, Revised Statutes 1899, that it is the policy of the state to re-imburse the sheriff for all money expended by him in the performance of his duties. (Bringolf v. Polk Co., 41 Ia. 554.)

*Henry C. Miller,* for defendant in error.

The service of the sheriff under the horse inspection law is rendered in the interest of the county and the public, in the performance of a police measure, and is such a service as is compensated for by the fixed salary provided for by law. The purpose of the inspection law was to protect the rightful owners of horses against clandestine removals. (Faith v. State, 32 Tex. 374; Houston v. State, 13 Tex. App. 600.)

The service is demanded by the shipper, not in his own interest, but because the law requires him to do so, and inflicts a penalty upon him if he neglects such duty. It would be difficult to believe that the services to be performed by the inspector, and the duties imposed upon the shipper, are not for the benefit of the public. The reason for such a law is apparent. The terms "civil cases," "civil causes," and "civil actions," are used in the constitution with reference to matters in court. And the term "civil cases" is defined as "a suit at law to redress the violation of some contract, or to repair some injury to the property, or to the person or personal rights of individuals." (7 Cyc. 153; Converse v. R. Co., 18 Mich. 459.) "Cases" and "causes" are used as synonymous in statutes and judicial decisions, each meaning a proceeding in court; a suit; an action. (Blyn v. U. S., 80 U. S. 581; Theisen v. Johns, 72 Mich. 285; Erwin v. U. S., 37 Fed. 470.) A civil action is a proceeding in a court of justice by one party

against another for the enforcement or protection of a private right, or for the redress and prevention of a private wrong. (Brown v. Crego, 29 Ia. 321; Iowa v. Ry. Co., 37 Fed. 497; Jefferson v. Philpot, 66 Ark. 233.) "Cases" is used synonymous with "causes" or "action." (Beecher v. Allen, 5 Barb. 169.) If the intent to allow the inspector the inspection fees by way of compensation is present in the statute, it is there only by inference, for it is not so specifically declared. Fees allowed to public officers are matters of strict law, depending upon the provisions of the statute. (U. S. v. Shields, 153 U. S. 88.) It is not the province of the court to read into the law something which will make the fees belong to the inspector. The constitutional debates show that civil actions in court were in the mind of the convention when framing Section 2 of Article XIV of the Constitution with reference to the salary and fees of the sheriff; and they show that it was intended that the sheriff should be compensated by a salary for all his public services rendered to the county.

POTTER, JUSTICE.

The plaintiff, Charles Messenger, alleging that he was and had been since January 1, 1906, the sheriff of Converse county, commenced this action in the district court in that county on April 7, 1908, to recover from the county certain fees amounting to $340.30 collected by him as provided by law for the inspection of horses; the said fees having been paid into the county treasury, as alleged in the petition, under an oral agreement with the county commissioners that the same should be held in a separate fund pending a judicial determination of the right of the plaintiff and defendant respectively to the fees so collected. The petition was demurred to on the specific ground that the fees belong to the county, and that it was the duty of the plaintiff to account for and pay the same into the county treasury. The demurrer was sustained, and the plaintiff elected to stand upon his petition, whereupon a judgment was rendered in favor of defendant for costs and dismissing the action.

The case is here on error. The only question presented is whether the fees aforesaid belong to the plaintiff or the county.

It is provided in Section 1 of Article XIV of the Constitution that all state, city, county, town and school officers shall be paid fixed and definite salaries, (excepting justices of the peace and constables in precincts having less than fifteen hundred population, and court commissioners, boards of arbitration and notaries public) ; and that the legislature shall, from time to time, fix the amount of such salaries as are not fixed by the constitution, the same to be in all cases in proportion to the value of the services rendered and the duty performed. Section 2 of the same article reads as follows :

"The legislature shall provide by law the fees which may be demanded by justices of the peace and constables in precincts having less than fifteen hundred population, and of court commissioners, boards of arbitration and notaries public, which fees the said officers shall accept as their full compensation. But all other state, county, city, town and school officers shall be required by law to keep a true and correct account of all fees collected by them, and to pay the same into the proper treasury when collected, and the officer whose duty it is to collect such fees shall be held responsible, under his bond, for neglect to collect the same; provided, that in addition to the salary of sheriff they shall be entitled to receive from the party for whom the services are rendered in civil cases such fees as may be prescribed by law." It is provided in Section 3 that the salaries of county officers shall be fixed by law within stated maximum limits.

It was provided by statute at the time the services in question were performed that sheriffs should receive the following annual salaries: "In counties of the first class, eighteen hundred dollars; in counties of the second class, fifteen hundred dollars; in counties of the third class, fifteen hundred dollars; in counties of the fourth class, twelve

hundred dollars." ·(Rev. Stat. 1899, Sec. 1112.) And that "the sheriff, in addition to his annual salary, shall be entitled to receive from the party for whom the·service is rendered in civil cases," certain stated fees. (*Id.* Sec. 1113.) The fees so provided for were for services in serving and returning, or executing a writ, process or notice; commission on money collected on execution or other final process; executing deed when necessary to be made by the sheriff upon any real property; and summoning each talesman juror. Subsequent sections provided for the payment of the expenses of the sheriff in caring for property taken by him in the execution of his duties, and executing any requisition issued by the governor for the reclamation of a fugitive from justice; for boarding prisoners in the county jail; and his actual and necessary traveling expenses while engaged in the discharge of his official duties. County officers receiving money for any county were required to pay the same into the county treasury of the proper county (*Id.,* Sec. 1232.)

The fees in question were collected under a statute enacted in 1901, providing for an inspection of horses about to be transported or driven out of the state. The statute declared it unlawful to ship, drive or in any manner remove beyond the boundaries of the state any herd, band or carload of horses until an inspection thereof, and made it the duty of every person or persons, association or corporation, shipping or driving any horses out of the state to hold the same at some convenient place for inspection. (Laws 1901, Ch. 79, Sec. 1.) It was also declared unlawful for any railroad company to receive such horses for such transportation until they were inspected and the company was furnished with a certificate by a duly authorized inspector showing that the brands upon the horses had been duly inspected. A violation of such provisions by any·railroad company, or any officer, agent or servant thereof, was made a misdemeanor punishable by fine. ʹ(*Id.,* Sec. 2.) And it was made a felony for any person or persons to remove

any band, herd or carload of horses beyond the limits of the state, without having them inspected as required by the act. (*Id.*, Sec. 7.) Sections 3, 4, 5 and 6 of the act were as follows:

"Sec. 3. The sheriff of each county shall be an inspector of horses under the provisions of this act and it is hereby made the duty of the sheriff of each county to perform the duties hereinafter provided as such live stock inspector, and he shall keep a record of all inspections made, giving the name of the owner and shipper of any horses, the several brands, the number of the car and the destination of the shipment. He shall file with the board of county commissioners of his county on the first day of each month, a complete report of all inspections made during the month and shall also furnish a copy of such report to the official newspaper of the county, and such report shall be published at the expense of the county, and the publisher of such paper shall forward a copy of his paper free of charge, containing such report to each of the sheriffs of the state."

"Sec. 4. Every person or persons, firm, association or corporation or their or either of their agents, servants or employees, having charge of any horses, destined for transportation by rail, or to be driven beyond the limits of this state, shall make application to the sheriff of the county in which such stock is located, or to his duly authorized agent, to inspect the brand or brands of any such horses, stating in such application the time and place, when and where said horses will be ready for inspection; and it shall be the duty of such sheriff, or his deputy, so notified, to attend at the time and place designated in such application and inspect said horses, make the necessary record, and give the necessary certificate required by the provisions of this act. Provided, that in all cases of horses transported out of this state by rail, the place of inspection shall be at some stock yard near the proposed point of shipment of said horses from this state, and, provided further, that if the owner or person in charge of said horses shall cause any

unreasonable delay or loss of time to such sheriff, or his deputy so notified to attend, such owner or person in charge of any such horses shall pay the expenses and salary of such inspector during such delay or loss of time, not to exceed five dollars per day." (As amended by Laws 1903, Ch. 54.)

"Sec. 5. It shall be the duty of the sheriff or his deputy to demand proof of ownership from the person, persons or corporations presenting horses and mules for inspection by brand record, bill of sale or the voucher of at least two responsible persons residing in the state, and said proof of ownership must be to the satisfaction of the inspecting sheriff or his deputies. " (As amended by Laws 1905, Ch. 8.)

"Sec. 6. Any sheriff or his deputy who shall knowingly make any false certificate under the provisions of this act, and who shall knowingly swear falsely as to the truth of any report made by him to the board of county commissioners, or who shall accept any bribe or compensation for the performance or failure to perform the duties prescribed by this act, shall upon conviction thereof be guilty of a felony, and be fined in a sum not exceeding one thousand dollars or imprisoned in the state penitentiary not exceeding five years, or both, at the discretion of the court."

An inspection fee was provided for in Section 8 as follows: "A fee of fifteen cents per head shall be charged on all horses inspected under the provisions of this act, and such fee or charge shall be a lien upon the horses inspected until the same shall be paid. Said fees shall be in full compensation for all services rendered in making such inspection." By that section also the sheriff was authorized to sell all unclaimed horses coming into his possession while discharging his duties as such inspector, and was required to pay the net proceeds of the sale into the county treasury to the credit of the general fund of the county; and provision was made whereby the owner of such estrays could receive such proceeds from the county.

As the statute was originally enacted Section 4 contained a provision apparently inconsistent with the provision of Section 8 for charging an inspection fee; it then providing that the inspection and record should be made and the certificate given "free of charge to the owner of said horses or to said railroad company or corporation provided, however, that the actual and necessary expenses of the sheriff or his deputy, in making such inspection, shall be paid by the county." That provision was omitted when the section was amended and re-enacted in 1903. The manner in ·which the two inconsistent provisions became included in the original act seems to be explained by the fact disclosed by the legislative journals that Section 8 was not in the bill when it was introduced and as it first passed the senate, but was added by an amendment in the house, subsequently concurred in by the senate upon the report of a conference committee. Without Section 8, the act closely followed, with some exceptions to be stated, a similar statute of Colorado, enacted in 1899, which did not provide for an inspection fee. The Colorado statute, however, applied to cattle as well as horses and required the inspection to be made by a cattle inspector to be designated by the state board of inspection. This is not referred to as a matter necessarily affecting the construction of the statute or the determination of the question here involved, but to show what apears to have been the situation at the time the act was passed in 1901, and the cause of the amendment of 1903. Whatever the legal effect of the inconsistent provisions aforesaid may have been it is at least clear that it was finally intended to require the payment of an inspection fee or charge, as provided in Section 8; and that so far as the original provisions of Section 4 conflicted therewith, it was the result of inadvertence.

A new statute on the subject was enacted in 1909 expressly requiring the inspection fees to be paid into the county treasury to the credit of the general fund of the county, and repealing the former acts, but with the proviso

that such repeal should not affect the validity of previous inspections or the status of any action or proceeding pending in the courts relative to fees or expenses incident thereto. (Laws 1909, Ch. 50.)

We do not think that the omission of the provision for making the inspection free of charge to the shipper or railroad company by the amendment of 1903 throws any light upon the question here presented, or discloses the intention of the legislature one way or the other as to the ownership of the inspection fees.   It merely made it certain that an inspection fee was to be charged, and left the statute as before without an express provision for the disposal of the money when collected.   Nor do we think that the provision of the act of 1909, requiring the inspection fees to be paid into the county treasury to the credit of the general fund of the county, has any effect upon the construction to be given the former statute in that respect, for, if it was permissible to either allow the sheriff to retain the fees or require him to pay them into the county treasury, the legislature might at one time provide for allowing the fees to the officer and at another for their payment into the county treasury; and therefore the fact that the latter provision is made by the later statute does not justify the presumption that it was so intended by the former statute, nor can it be regarded as a legislative construction of the former statute in that particular.   But it is expressly stated in the act of 1909 that the repeal of the previous acts shall not affect the status of any action or proceeding pending in the courts relative to fees incident to previous inspections, indicating, we think, a purpose not only to preserve rights acquired under the statute repealed, but to preclude a consideration of the act as in any way affecting such rights or the construction of the former statute; the legislature no doubt well knowing at the time that the ownership of fees previously collected had become a matter of much controversy.

While counsel differ as to the meaning and effect of the act of 1901, amended as aforesaid, with reference to the

right of the sheriff to retain the fees as perquisites of his office, the arguments mainly relate to the meaning of the term "civil cases" as used in that provision of the constitution authorizing the sheriff, in addition to his salary, to receive from the party for whom the services are rendered in civil cases such fees as may be prescribed by law. The county attorney contends that the fees thus permitted to be retained are those only that are earned in court proceedings, and it is argued that the term "civil cases" is used synonymously with "civil causes." Counsel for plaintiff, on the other hand, contend that it includes all matters coming within the duties of the sheriff as contradistinguished from criminal matters, and is not to be restricted to civil actions or causes in court; that the question is not whether the services were rendered for the county, but only whether the fees were or were not collected for services rendered in a matter not criminal, and, if not, that then the fees belong of right to the sheriff, and the legislature would have no power to provide otherwise.

It must be conceded that the term "civil cases," as found. in the constitutional provision aforesaid, is used in contradistinction to "criminal cases." But that does not dispose of the question, for it is necessary to consider what is meant by the word "cases" in that connection. The distinguishing words are "civil" and "criminal." As opposed to "criminal" the word "civil" is defined in Bouvier's Law Dictionary as indicating the private rights and remedies of men, as members of the community, in contrast to those which are public and relate to the government; "thus we speak of civil process and criminal process, civil jurisdiction and criminal jurisdiction." In Anderson's Law Dictionary the word is thus defined: "Concerning the rights of and wrongs to individuals considered as private persons, in contradistinction to criminal or that which concerns the whole political society, the community, state, government; as, civil action, case, code, court, damage, injury, * * * proceeding, procedure, process, remedy * * *." (Hockey-

meyer v. Thompson, 150 Ind. 176.)   In this sense it is defined in the Century Dictionary and Cyclopedia as, "relating to property and other rights maintainable in law at the owner's suit:   opposed to criminal; as, civil actions, civil courts, civil remedies."   And in Webster's New International Dictionary as follows:   "Relating to the private rights of individuals in a community and to legal proceedings in connection with them; pertaining to rights and remedies sought by action or suit distinct from criminal proceedings."

In ordinary phraseology the word "case" means "event," "happening," "instance," "condition," and the like, but in a legal sense it means "cause," "suit," "action"; "a contested question before a court of justice."   (Bouvier's Law Dictionary; Calderwood v. Peyser, 42 Cal. 115; U. S. v. Dolla, 177 Fed. 101; *In re*. Dist. Atty., 23 Fed. 26; U. S. v. Volz, 28 Fed. Cas. 384; Dickey v. Smith, 42 W. Va. 805; Kundorf v. Thalheimer, 12 N. Y. 593; Gold v. R. R. Co., 19 Vt. 478; Crum v. Johnson (Neb.), 92 N. W. 105.) "The words 'case' and 'cause' are constantly used as synonyms in statutes and judicial decisions, each meaning a proceeding in court, a suit or action."   (Blyew v. U. S., 13 Wall. 581; Erwin v. U. S., 37 Fed. 470.)   The different meanings of the word "case" is well illustrated in Dickey v. Smith, *supra*.   A section of the statute was under consideration which provided that on certain stated grounds and conditions a justice might set aside a verdict "and award a new trial in the *case*," and that "in such *case* he shall appoint a time for a new trial" and that no more than one new trial should be granted by the justice "in any *case*." The court said that the word "case" was used three times in the section—"the first time to denote the suit, the second time to denote the event"; and in determining its meaning as used the third time, the court gave to the word its phraseological, combined with its technical meaning, and held that the section allowed one new trial only to either party, that is to say, that each party had the right to make one application for a new trial.

A "civil case" is defined as a suit at law to redress the violation of some contract, or to repair some injury to property, or to the person or personal rights of individuals. (Shultz's Lessee v. Moore, Wright's Ohio Rep. 280; 7 Cyc. 153.) An action brought to recover some civil right, · or to obtain redress for some wrong, not being a crime or misdemeanor. (6 Am. & Eng. Ency. L. (2nd Ed.) 96.) The term "civil cases" is frequently used in statutes synonymously with "civil actions" or "civil causes," and has been held to have the same meaning, or something more or less, depending upon the subject and the connected provisions of the statute. In Adkins v. Andrews, 96 N. W. 228, the court was called upon to consider a constitutional provision allowing appeals in all criminal cases on the application of the defendant; "in all civil cases on the application of either party, and in such other cases as may be provided by law." It was held that a summary statutory proceeding, such as forcible entry and detainer, came under the term "other cases" rather than under the head of "civil cases." The court say: "It is true the proceeding is a civil case, in the sense that it is not criminal * * * but the question is not as to the meaning of civil cases in general, but as to the sense in which those words are used in the constitutional provision." In Indiana it was held, under an act conferring jurisdiction upon a certain court "in all cases of appeals from * * * boards of county commissioners or city courts in civil cases," that jurisdiction was conferred of an appeal from a judgment of the commissioners establishing a drain; the court holding that a drainage proceeding was a civil case within the meaning of the act. It was said in the opinion that the term "civil cases" as used in the statute was to be construed as including all cases other than criminal cases. (Hockeymeyer v. Thompson, 150 Ind. 176.)

The term is employed in the provision we are considering to describe a certain class of cases for the purpose of regulating the compensation of the sheriff, and in that

connection it is to be broadly construed as inclusive of all "cases" not criminal. That it was intended to cover all cases involving private rights as distinguished from a public prosecution for a crime or misdemeanor cannot, we think, be doubted. It is, however, to be construed as a legal term and not according to the ordinary meaning of the word "case," as an "event" or "instance." Counsel for plaintiff in their brief substitute the word "matters" for "cases." But it is doubtful at least if that adds anything to the meaning of the provision, for "civil matters" might have the same meaning as "civil cases." (College &c. v. Guilbert, 100 Ia. 219; Bell v. West Point, 51 Miss. 270.) We are not at liberty, however, to substitute other words for those employed. It is not provided that the sheriff shall be entitled to receive fees for all his official acts except in criminal cases, but that he shall be entitled to the fees for services rendered in "civil cases." It may have been intended primarily to provide a salary for "public business" and fees for such other business as might require the services of the sheriff, but in determining the question, we are confined to the description of the fees as found in the provision, and it is impossible to ignore the words "in civil cases" as expressing what was intended. Not only was a legal term employed but it must be held to have been used in a legal sense, if indeed it is capable of any different use; and we think that it was used as meaning a legal proceeding of some nature for the protection or enforcement of a private right or the redress of a private wrong.

This was not the first use of the term "civil cases" with reference to the fees of sheriffs. It had been so employed from the time of the organization of Wyoming as a territory. (Laws 1869, Ch. 33, Sec. 3.) By an act approved March 9, 1882, it was provided that sheriffs should receive an annual stated salary and that in addition to such salary *"they shall be entitled to receive from the party for whom the services are rendered in civil cases"* certain stated fees. (Laws 1882, Ch. 45.) That was the statute regulating the

compensation of the sheriff when the constitution was framed and adopted. (Rev. Stat. 1887, Sec. 1182.) It will be observed that the fees allowed to be received by the sheriff in addition to his salary are described in the constitution in identically the same language as that found in the statute in force at the time. This compels the conclusion, we think, that the statute was in mind when the provision was inserted in the constitution, and that the term "civil cases" was used in the same sense in the constitution as in the statute. Indeed, it was well known that one of the objects of the article in the constitution relating to salaries was the reduction of the compensation of county officers as fixed by the statute then in force.

The fees prescribed by the statute in connection with the provision aforesaid were for the service and return of process; mileage in serving the same; serving order of attachment, order of arrest, for delivery of property, injunction order; executing writ of possession; levying execution; commission on money collected on execution or other final process; advertising property for sale; for executing deed when necessary to be made by sheriff; for summoning jurors; executing writ of habeas corpus and order of commitment. All these services, with the possible exception of executing a deed under some circumstances, relate to suits or proceedings in court, and as the principal duties of a sheriff are connected with the business of the courts, it is clear at least that the term "civil cases" was used in the statute, and in the constitution by adopting the statutory form of expression, as referring generally to a class of legal proceedings invoked for the protection of private interests. But in the decision of this case we are not inclined nor do we think it necessary to restrict its meaning to a proceeding in court. The statute is not to be regarded as having prescribed all the fees that could properly be prescribed under the head of civil cases, but, so far as the question before us is concerned, as merely indicating generally the sense in which the term "civil cases"

was employed; and a construction of the constitutional provision which would confine the fees allowed to those that had been prescribed by the statute could not be justified. There may be proceedings for the protection or enforcement of individual rights not required to be prosecuted in a court, or any tribunal exercising judicial powers, but requiring the services of the sheriff in his official capacity for the sole benefit of the party or parties interested, to which the term would be applicable, as it is found employed in the provision under consideration; and we prefer to leave any such question for consideration when it arises. We agree to some extent with the proposition stated by counsel that the question is not whether the services were performed for the county. There may indeed be civil cases in which the county may be a party in its corporate capacity, or even the state, in which the sheriff would be entitled to his fees, though payable by the county or state as the party for whom the services are rendered. The question is whether the services were rendered and the fees collected in civil cases.

The fees were collected in the exercise of a duty imposed upon the sheriff by a law passed for the protection of the public against fraud or crime in relation to a class of property that may more or less easily, according to circumstances, be wrongfully appropriated and removed beyond the state without detection; and the statute requiring an inspection of the property before its removal tends to render such fraudulent or criminal practices more difficult, and by preserving and publishing a record of the inspections assists in identifying the owner, and discovering the wrongful or unlawful act if any has been committed. (Territory ex rel. v. D. & R. G. R. Co., (N. M.) 78 Pac. 74, affirmed in McLean v. D. & R. G. R. Co., 203 U. S. 53.) In the case cited the Supreme Court of the United States say with reference to a similar statute of New Mexico providing for an inspection of hides: "The purpose of these provisions is apparent, and it is to prevent the criminal or

fraudulent appropriation of cattle by requiring the inspection of hides and registration by a record which preserves the name of the shipper and purchaser of the hides, as well as the brands thereon, and by which is afforded some evidence, at least, tending to identify the ownership of the cattle. It is evident that the provision as to the shipment of the hides beyond the limits of the territory is essential to this purpose, for if the hides can be surreptitiously or criminally obtained and shipped beyond such limits, without inspection or registration, a very convenient door is open to the perpretration of fraud and the prevention of discovery." And again: "In the Territory of New Mexico, and other parts of the country similarly situated, it is highly essential to protect large numbers of people against criminal aggression upon this class of property. The exercise of the police power may and should have reference to the peculiar situation and needs of the community. The law under consideration, designed to prevent the clandestine removal of property in which a large number of people of the territory are interested, seems to us an obviously rightful exercise of this power. It is true it affects interstate commerce, but we do not think such was its primary purpose, and while it may have an effect to levy a tax (the inspection fee) upon this class of property, the main purpose evidently was to protect the people against fraud and wrong."

As generally stated, the object of inspection laws is to protect the community so far as they apply to domestic sales, from frauds and impositions; and in relation to articles designed for exportation to preserve the character and reputation of the state in foreign markets. (22 Cyc. 1364.) "Inspection is the examination of certain articles made by law subject to such examination, so that they may be declared fit for commerce; an examination of an article to determine its fitness for a given purpose." (16 Am. & Eng. Ency. L. 808.) While the object of the statute under consideration may differ materially from that

of inspection laws generally, it is nevertheless an inspection law, as was held in the case of Neilson v. Garza, 2 Woods, 287, Fed. Cas. No. 10,091, which has been frequently cited with approval. In that case it was said by Circuit Judge Bradley: "The exporter must obtain the certificate of the inspector, or his deputy, of the county into which the hides were imported, certifying (note what things are to be certified) the date of the importation, the names of the importer and of the owner and of the person in charge, name of the place where imported, and description of the marks and brands, if any there be, by which they can be identified. What is this but inspection? The party is to subject the hides or animals to the examination of the official inspector, that he may note everything about them serving to their identification, ownership, etc. I do not say that such an inspection as this is necessary or expedient, but it is inspection; and at such a place as Brownsville it may for aught I know, be necessary police regulation to prevent frauds and clandestine removal and exportation of property belonging to the people of Texas." The complainant in that case was engaged in importing hides from Mexico to Brownsville, Texas, and thence to New York.

Now it is held to be proper for a state, as an incident to its power to enact valid inspection laws, to impose a reasonable charge for the purpose of defraying the expenses of the inspection. (17 Am. & Eng. Ency. L. 81; McLean v. D. & R. G. R. Co., *supra;* Wadhams Oil Co. v. Tracy, 114 Wis. 150; 22 Cyc. 1368.) The charges or fees are justified only on the ground that they are regulation expenses, and as imposed for the purpose of laying the burden of executing the law upon the property involved. (Authorities above cited.) Though the fees are paid by the party whose duty it is to have the property inspected, the services of the inspecting officer are rendered distinctively for and in the interest of the public. The duty of the sheriff is not confined to merely inspecting the animals and giving the certificate showing inspection. He is required

to make a public record of the inspection and to report the same to the board of county commissioners. The record and report are surely not required for the benefit of the shipper or drover. Again, the report is required to be published at the expense of the county; and it may be that an inspection fee was required for the purpose partially, at least, of providing for that expense. It is true that upon satisfying the inspecting officer of his right to do so, the shipper or drover is enabled by the inspection and the issuance of the certificate, where that is required, to lawfully proceed with the transportation or removal of the animals out of the state. That does not, however, constitute the act of the inspecting officer a service rendered the shipper or drover, in the sense in which we speak of the services of a sheriff in a civil case as services rendered for a party thereto. The object of the provision of Section 6 of the statute making it a felony for the sheriff to accept compensation for the performance or failure to perform duties imposed upon him by the act was evidently to better insure the faithful performance on the part of the sheriff of his duties to the public. The statute was passed and the inspection was required for the benefit of the public, not the party whose duty it was to present the animals for inspection.

We therefore conclude that the acts of the plaintiff in error, as sheriff and inspector of horses, were not services rendered in civil cases within the meaning of the constitutional provision allowing the sheriff to receive fees for services in such cases. The demurrer to the petition was properly sustained, and the judgment will be affirmed.

*Affirmed.*

BEARD, C. J., concurs.
SCOTT, J., did not sit.